**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Alex Barlow
abarlow@scott-scott.com
Kyle Dingman
kdingman@scott-scott.com
7718 Wood Hollow Dr.
Suite 105
Austin, TX 78731

**WADE KILPELA SLADE LLP**
Edwin J. Kilpela, Jr.
ekilpela@waykayslay.com (*pro hac vice*
application forthcoming)
David Slade (*pro hac vice* application
forthcoming)
slade@waykayslay.com
Sara D. Avila, State Bar No. 263213
savila@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@waykayslay.com
2450 Colorado Ave.
Suite 100E
Santa Monica, CA 90404

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INFINITE CHEMICAL ANALYSIS LABS, LLC; and ANRESCO INCORPORATED D/B/A ANRESCO LABORATORIES <br><br> Plaintiffs <br><br> vs. <br><br> PRIDE ANALYTICS and CONSULTING, LLC AND 2 RIVER LABS, collectively D/B/A 2 RIVER LABS, INC.; VRX LABS, D/B/A 8 LANE INVESTMENTS, INC.; BELCOSTA LABS LONG BEACH LLC, D/B/A BEL COSTA LABS; CALIGREEN LABORATORY; CALIFORNIA CANNABIS TESTING LABS, D/B/A CC TESTING LABS; CALIFORNIA AG LABS, D/B/A | Case No.   2:24-cv-5311 <br><br> **COMPLAINT** |

**COMPLAINT**

CERTIFIED AG LABS; VK LABS, LLC, D/B/A DECANO ANALYTICAL LABORATORIES; ENCORE LABS LLC, D/B/A ENCORE LABS; EXCELBIS LABS LLC, D/B/A EXCELBIS LABS; GREEN LEAF LABS CA LLC, D/B/A GREEN LEAF LAB; HARRENS LAB INC.; LANDAU LABORATORIES, INC., D/B/A LANDAU LABS; and VERITY ANALYTICS, LLC, D/B/A VERITY ANALYTICS,

   Defendants.

**COMPLAINT**

**INTRODUCTION**

1.     In every state with regulated cannabis, there are strict testing and labeling requirements, enabling consumers to make informed purchasing and medicating decisions.

2.     Among other requirements, these regulations require any product introduced into the stream of commerce to be entirely free of certain harmful— indeed, toxic—pesticides and other adulterants.

3.     Further, the regulations state that the THC/cannabinoid content on the label must be within a particular relative percent difference of the actual tested results for the product to be salable. In California, that threshold is +/- 10% (thus, consumers and patients should know, by law, the potency of any cannabis product they buy, within a 10% margin of error).

4.     Understandably, consumers anticipate that any cannabis products they purchase in a commercial setting will be devoid of illegal toxic chemicals.

5.     Additionally, THC percentage in cannabis products is a critical selling point (it is often *the* critical selling point), with a direct correlation between the product's advertised potency and its retail value.  In turn, this has created pressure on cultivators and manufacturers to consistently increase the THC potency on their products' labels, as higher potency numbers lead to higher sales volumes and prices.

6.     In seeking to market and sell their products, many players have turned to out-and-out fraud, colluding to harm consumers via a process called "lab shopping," in which cannabis brands seek out the labs that will (1) turn a blind eye to pesticide contaminations in their products and (2) give them the most inflated THC levels, regardless of what is supported by empirical data.

7.     There are approximately 30 Department of Cannabis Control (DCC) licensed labs in California, and competition is fierce to maintain market share in a plateauing industry.

**COMPLAINT**

8.     Whereas competition used to be healthy and revolved around quality, turnaround time and customer service, it has now devolved into a free-for-all, in which brands and laboratories agree, jointly, to ignore "safety fails" (that is, contamination in test batches) and to inflate THC potency claims—claims which are unsupported and unsupportable by science—in an effort to drive up prices and even hide the presence of dangerous chemicals.

9.     The practice of lab shopping has become so prevalent that labs openly advertise their willingness to guarantee specific results, such as higher potency values, to gain customers without fear of recourse.

10.     In one test conducted shortly after the legalization of cannabis, independent laboratories—including Plaintiffs—purchased and tested over 150 randomly chosen flower samples off dispensary shelves. The results were staggering. ***Eighty-seven percent of the samples failed their label claims*** (*i.e.*, were >10% deviant of their labeled values), with over half of the samples >20% deviant of their labeled THC values (i.e., over 2x the legal permitted variance).[1]

11.     This number has remained constant since.  A recently published journal article funded by the National Marijuana Initiative assessed the accuracy of cannabinoid labeling for commercial products and found virtually identical results.[2] The authors tested samples from 3 different states: Oregon, Colorado, and California. Their results showed that THC potency in California was overstated by 40% overall. Only 12% of samples—8 of the 68 products from California—were within 10% of the label claim (the acceptable limit for deviation from label claims that the labs are allowed by the DCC). A full 75% of samples didn't even come within 20% of the claim on the label.[3]

---

[1] Jay Barmann, *80 Percent of Medical Marijuana Tested at Recent NorCal Conference is Tainted With Mold, Other Toxins*, SFist (Aug. 31, 2017) (available at https://sfist.com/2017/08/31/80_percent_of_medical_marijuana_tes/).
[2] Geweda *et al.*, *Evaluation of dispensaries' cannabis flowers for accuracy of labeling of cannabinoids content*, Journal of Cannabis Research (2024) 6:11 (available at https://doi.org/10.1186/s42238-024-00220-4)
[3] *Id.*

**COMPLAINT**

12.     Additionally, independent tests found multiple cases of unreported Category I pesticides in some of the analyzed samples at multiple times the legal limit – a significant public health concern.  This level of undisclosed contamination—while entirely unlawful—is alarmingly prevalent.  A separate study from 2017 found that *as much as 80% of cannabis products available for purchase are contaminated with "mold, fungus, bacteria, pesticides, or harmful solvents.*"[4]

13.     Sadly, now that the practice of lab shopping, burying safety fails, and potency-inflation have become widespread, there is no end in sight, and no place for honest brokers in the marketplace, absent external intervention.

14.     Neither consumers nor even dispensaries could be expected to know which products on the shelf disguise contamination or inflate potency, and which do not (consumers and dispensaries are not laboratories, after all).

15.     Likewise, laboratories that are *not* willing to inflate their numbers, or to look the other way when contaminants show up in test results, must be ready to watch customers walk out the door to maintain their principles.

16.     This has become an existential dilemma for participants in the marketplace who seek to abide by the rules.

17.     Plaintiffs Infinite Chemical Analysis Labs, LLC and Anresco Incorporated bring this action, asserting claims under the Lanham Act, 15 U.S.C. § 1125(a), against a group of laboratories for their participation in laboratory shopping and THC-potency-inflation, which has not only caused significant harm to Plaintiffs' business, but which has also introduced widespread fraud in the California cannabis marketplace.

## PARTIES

**Plaintiffs**

18.     Plaintiff Infinite Chemical Analysis Labs, LLC ("ICAL") is a laboratory

---

[4] Jay Barmann, *80 Percent of Medical Marijuana Tested at Recent NorCal Conference is Tainted With Mold, Other Toxins*, SFist (Aug. 31, 2017) (available at https://sfist.com/2017/08/31/80_percent_of_medical_marijuana_tes/).

3

**COMPLAINT**

operating in San Diego, California that offers, *inter alia*, testing for cannabis and hemp products. Plaintiff is licensed as a commercial testing laboratory by the DCC, license no. C8-0000047-LIC.

19.    Plaintiff Anresco Incorporated d/b/a Anresco Laboratories ("Anresco") is a laboratory operating in San Francisco, California that offers, *inter alia*, testing for cannabis and hemp products. Plaintiff is licensed as a commercial testing laboratory by the DCC, license no. C8-0000052-LIC.

**Defendants**

20.    **2 River Labs:** Defendant Pride Analytics and Consulting, LLC, and Defendant 2 River Labs, collectively d/b/a 2 River Labs, Inc. ("2 River Labs") jointly operate a California-based laboratory licensed to test cannabis and hemp products.

21.    **8 Lane Investments, Inc.:** Defendant VRX Labs, d/b/a 8 Lane Investments, Inc. ("8 Lane Investments, Inc.") is a California-based laboratory licensed to test cannabis and hemp products.

22.    **Bel Costa Labs:** Defendant Belcosta Labs Long Beach LLC, d/b/a Bel Costa Labs ("Bell Costa Labs") is a California-based laboratory licensed to test cannabis and hemp products.

23.    **Caligreen Laboratory:** Defendant Caligreen Laboratory ("Caligreen Laboratory") is a California-based laboratory licensed to test cannabis and hemp products.

24.    **CC Testing Labs:** Defendant California Cannabis Testing Labs, d/b/a CC Testing Labs ("CC Testing Labs") is a California-based laboratory licensed to test cannabis and hemp products.

25.    **Certified Ag Labs:** Defendant California AG Labs, d/b/a Certified Ag Labs ("Certified Ag Labs") is a California-based laboratory licensed to test cannabis and hemp products.

**COMPLAINT**

26.   **Decano Analytical Laboratories:** Defendant VK Labs, LLC, d/b/a Decano Analytical Laboratories ("Decano Analytical Laboratories") is a California-based laboratory licensed to test cannabis and hemp products.

27.   **Encore Labs:** Defendant Encore Labs LLC, d/b/a Encore Labs ("Encore Labs") is a California-based laboratory licensed to test cannabis and hemp products.

28.   **Excelbis Labs:** Defendant Excelbis Labs LLC, d/b/a Excelbis Labs ("Excelbis Labs") is a California-based laboratory licensed to test cannabis and hemp products.

29.   **Green Leaf Lab:** Defendant Green Leaf Labs CA LLC, d/b/a Green Leaf Lab ("Green Leaf Lab") is a California-based laboratory licensed to test cannabis and hemp products.

30.   **Harrens Lab Inc.:** Defendant Harrens Lab Inc. ("Harrens Lab Inc.") is a California-based laboratory licensed to test cannabis and hemp products.

31.   **Landau Labs:** Defendant Landau Laboratories, Inc., d/b/a Landau Labs ("Landau Labs") is a California-based laboratory licensed to test cannabis and hemp products.

32.   **Verity Analytics:** Defendant Verity Analytics, LLC, d/b/a Verity Analytics ("Verity Analytics") is a California-based laboratory licensed to test cannabis and hemp products.

## JURISDICTION AND VENUE

33.   This Court has jurisdiction over this lawsuit because this lawsuit arises under the Lanham Act, 15 U.S.C. § 1125.

34.   Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to this claim occurred in this district.

//

//

//

**COMPLAINT**

# FACTUAL ALLEGATIONS

## I.   CANNABIS PRODUCTS IN CALIFORNIA

### A. Overview of the Regulatory Landscape

35.   With the 2016 passage of the Control, Regulate and Tax Adult Use of Marijuana Act (Proposition 64 or "Prop 64"), the recreational use of cannabis was legalized in California, with sales commencing in January 2018.

36.   Prop 64 also established a robust regulatory regime governing, *inter alia*, testing, packaging, and labeling requirements for cannabis sold within California.

37.   The agency tasked with developing and administering these regulations is the Department of Cannabis Control ("DCC"), and the regulations under the DCC's purview are set forth under the California Code of Regulations, Title 4, Division 16: "Department of Cannabis Control."  Cal. Code Regs. tit. 4, § 15000, *et seq.*

### i.   Labeling Requirements – THC Content

38.   Like other consumer products, cannabis must be truthfully and accurately labeled. As the DCC explains, "Cannabis must be properly labeled to make sure consumers are informed about what they are buying."[5]

39.   The primary active ingredient in cannabis is the cannabinoid compound tetrahydrocannabinol, commonly known as "THC." THC is the chemical responsible for most of marijuana's psychoactive effects."[6]

40.   DCC regulations require that the label of cannabis products include a declaration of the product's THC content.[7]  Depending on the nature of the product, the THC content can be expressed as a percentage (for example, 30% THC) or in milligrams (for example, 550mg).[8]

41.   Additionally, DCC regulations require that the THC content (or content of any other cannabinoid in a given product) identified on a product's label must be

---

[5]   https://cannabis.ca.gov/wp-content/uploads/sites/2/2021/12/labeling-checklist-manufactured-products.pdf
[6] https://www.livescience.com/24553-what-is-thc.html
[7] Cal. Code Regs. tit. 4, § 17407 – "Cannabinoid Content Labeling"
[8] *Id.*

**COMPLAINT**

within 10% of what is actually in the package.[9]  Per the DCC regulations, "the difference in percent shall be calculated using the following equation: Difference in percent = | (laboratory measurement - label claim) | / (label claim) y 100%."[10]

42.    Thus, if the THC content is expressed as a percentage and is listed as 30%, the actual THC of the product must be between 27-33%.  Alternatively, if the THC content of the product is expressed in milligrams and is listed as 550mg, then the actual THC content of the product must be between 495mg and 605mg.

### ii.    Testing Requirements – Ensuring Accurate Measurement of THC Content and Testing for Harmful Substances.

43.    Prior to being packaged for sale, cannabis products must be tested by a licensed laboratory.[11]  Per the DCC, "all batches of cannabis goods to be tested before they can be sold. Laboratories test cannabis goods to make sure they are free of contaminants and labeled with accurate amounts of cannabinoids and terpenes."[12]

44.    Laboratories conduct their tests based upon samples provided by other licensed cannabis businesses, such as a distributor.[13]

45.    Beyond testing the THC content of a sample, the laboratory must also test each sample for the following:[14]

- Cannabinoids;
- Foreign material;
- Heavy metals;
- Microbial impurities;

[9] Cal. Code Regs. tit. 4, § 15307.1(a) ("For purposes of this division, any one cannabinoid, Total THC, and/or Total CBD claimed to be present on a label shall not be considered inaccurate if the difference in percentage on the certificate of analysis is plus or minus 10.0%.")

[10] Cal. Code Regs. tit. 4, § 15307.1(c)

[11] Cal. Code Regs. tit. 4, § 15406(d) (prohibiting the sale of cannabis to consumers unless "[t]he cannabis goods have undergone laboratory testing as required by the Act and chapter 6 of this division[.]")

[12] DCC, *Testing Laboratories* (available at https://cannabis.ca.gov/licensees/testing-laboratories/)

[13] Cal. Code Regs. tit. 4, § 15304 ("After taking physical possession of a batch of cannabis or cannabis products, the licensed distributor shall contact a licensed testing laboratory and arrange for a laboratory employee to come to the licensed distributor's licensed premises to select a representative sample for laboratory testing."); *see also* Cal. Code Regs. tit. 4, § 15305 (establishing protocols for sample selection).

[14] Cal. Code Regs. tit. 4, § 15714(b)(1)-(9).

**COMPLAINT**

- Mycotoxins;
- Moisture content and water activity;
- Residual pesticides;
- Residual solvents and processing chemicals; and
- If applicable, terpenoids.

46.   The laboratory must also report the results of each of these tests on the "Certificate of Analysis" or "COA,"[15] a document that is generated for each tested sample and provided to (1) the DCC; and (2) the "track and trace system."[16]

47.   Critically, the COA must be provided to the DCC and uploaded to the track and trace system *before* the laboratory releases any individual or cumulative test results to any other person—including the party that hired the laboratory to do the testing.[17]

48.   The COA must contain, *inter alia*: (1) the analytical methods, analytical instrumentation used, and corresponding Limits of Detection ("LOD") and Limits of Quantitation ("LOQ"); and (2) a list of all analytes detected during the analyses of the sample that are unknown, unidentified, or injurious to human health if consumed, if any.[18]

49.   The COA must also provide a "pass" or "fail" indication for each analyte listed Cal. Code Regs. tit. 4, § 15714(b)(1)-(9) (and enumerated in paragraph 44, above).[19]

---

[15] Cal. Code Regs. tit. 4, § 15714(c)

[16] Cal. Code Regs. tit. 4, § 15726(c); In January 2018, the California Cannabis Track-and-Trace system ("Track and Trace" or "CCTT") was launched. Track and Trace is the program used statewide to record the inventory and movement of cannabis and cannabis products through the commercial cannabis supply chain—from seed to sale—and it is now being used by cannabis businesses with an annual or a provisional license. Track and Trace uses unique identifiers (UIDs) for reporting the movement of cannabis and cannabis products through the licensed commercial cannabis distribution chain. The state's contracted service provider for the track-and-trace system is METRC, Inc., a technology company that uses the METRC (Marijuana Enforcement, Tracking, Reporting, and Compliance) software program. *See, generally,* DCC, et al., *FREQUENTLY ASKED QUESTIONS About the California Cannabis Track-and-Trace System* (available at https://www.cdfa.ca.gov/calcannabis/documents/CCTT_FAQ.pdf)

[17] Cal. Code Regs. tit. 4, § 15726(d)

[18] Cal. Code Regs. tit. 4, § 15726(e)

[19] Cal. Code Regs. tit. 4, § 15726(f)

**COMPLAINT**

50.   For example, when conducting required testing for residual pesticides,[20] if the laboratory results show *any* amount of a "Category I" pesticide in the tested sample, or an amount of a "Category II" pesticide that exceeds the amounts established in the DCC regulations, then the sample fails the test and the batch from which the sample was collected may not be released for retail sale.[21]

51.   With the exception of terpenoid analytes, a "fail" indication for any of the analytes listed in Cal. Code Regs. tit. 4, § 15714(b)(1)-(9) (and enumerated in paragraph 44, above), means that the batch of cannabis product being tested may not be released for retail sale.[22]

52.   Following a failed testing, the owner of the batch may arrange for remediation or reprocessing in an attempt to cure the defect.[23]   However, the batch may not be retested in the absence of such remediation or reprocessing.[24]

### iii.  Testing Licensure and Standards

53.   To receive a license to test cannabis products, a laboratory must meet several criteria.   Among other requirements, the laboratory must establish and maintain ISO/IEC 17025 accreditation for testing (1) cannabinoids; (2) heavy metals; (3) microbial impurities; (4) mycotoxins; (5) residual pesticides; (6) residual solvents and processing chemicals; and (if tested) terpenoids.[25]

54.   In the event that a laboratory does not have this accreditation, it may apply for an interim license—valid for 12 months—as long as the laboratory provides an attestation that it intends to seek ISO/IEC 17025 accreditation for the above-identified

---

[20] *See,* Cal. Code Regs. tit. 4, § 15714(b)(7).

[21] Cal. Code Regs. tit. 4, § 15719(d)(1)-(2); § 15719(e).

[22] *See,* Cal. Code Regs. tit. 4, § 15717(c) (moisture content and water activity); Cal. Code Regs. tit. 4, § 15718(d) (residual solvents and processing chemicals); Cal. Code Regs. tit. 4, § 15719(e) (residual pesticides); Cal. Code Regs. tit. 4, § 15720(e) (microbial impurities); Cal. Code Regs. tit. 4, § 15721(d) (mycotoxin); Cal. Code Regs. tit. 4, § 15722(f) (foreign material); Cal. Code Regs. tit. 4, § 15723(d) (heavy metals); Cal. Code Regs. tit. 4, § 15724(g) (cannabinoids).

[23] Cal. Code Regs. tit. 4, § 15727; *See also,* Cal. Code Regs. tit. 4, § 17305 (identifying standards for remediation of failed batches).

[24] *Id.*

[25] Cal. Code Regs. tit. 4, § 15701

9

**COMPLAINT**

analyte testing methods.[26]  The interim license may be renewed once, for an additional 12-month period; and after such time the entity may only seek further renewal of the interim license if the licensee provides evidence that it has submitted an application for ISO/IEC 17025 accreditation.[27]

55.   Regardless of whether the laboratory has its ISO/IEC 17025 accreditation, it *must* establish test methods that comport with the following guidelines: (1) US Food and Drug Administration's Bacterial Analytical Manual, 2016; (2) AOAC International's Official Methods of Analysis for Contaminant Testing of AOAC International, 20th Edition, 2016; and (3) United States Pharmacopeia and the National Formulary's Methods of Analysis for Contaminant Testing, 2016.[28]

56.   Additionally, licensed laboratories must be independent of any other licensed cannabis businesses.  Pursuant to statute, a licensed testing laboratory "shall maintain independence from persons who hold a license or an interest in a commercial cannabis business licensed for any activity other than testing"[29]; "shall not employ any person who is employed by, or is an owner or financial interest holder of, a commercial cannabis business licensed for any activity other than testing" [30]; and "shall not offer or agree to provide preferential treatment, including discounted testing services, to any other licensee unless the offer or agreement is available to all licensees."[31]

### B. Actors Across the Marketplace—Including Defendants—Conspire to Inflate THC Potency Numbers, Hide Safety Fails on Contaminated Batches, and Generally Deceive Consumers.

57.   In the competitive cannabis industry, particularly in California, a disturbing pattern has emerged where certain testing laboratories and cannabis sellers

---

[26] Cal. Code Regs. tit. 4, § 15703
[27] *Id*.
[28] Cal. Code Regs. tit. 4, § 15712
[29] Cal. Code Regs. tit. 4, § 15004.1(a)
[30] Cal. Code Regs. tit. 4, § 15004.1(d)
[31] Cal. Code Regs. tit. 4, § 15004.1(e)

**COMPLAINT**

have engaged in deceptive practices aimed at artificially inflating the THC potency numbers reflected in the COAs of advertised cannabis products and/or ignoring safety fails in tested batches.[32]

58.    This systemic fraud is not an isolated phenomenon but rather is becoming a pervasive issue across the marketplace, affecting numerous stakeholders, including consumers, legitimate businesses, and the integrity of the industry as a whole.

59.    The motivation for ignoring the presence of contaminants is alarming but simple: if the lab were to accurately report the results, the batch of product being tested could not be sold; if the lab ignores the contaminants, then the products are marketable.

60.    In the case of THC potency inflation, the practice is driven by the high consumer demand for products with elevated THC levels. As explained by one industry expert:

> "Labs are motivated to do this to gain market share. The labs' customers pressure them to inflate potency. This pressure comes from the retail side, and ultimately originates from consumer demand for higher label numbers."[33]

61.    Higher potency drives both sales price and consumer demand, affecting how long product sits on the shelves.[34]

62.    For example, one industry source reports that high-potency cannabis (containing 21-28 % THC) commanded more than twice the price per gram as low potency cannabis (containing 7-14% THC) ($11.06 per gram vs $5.31).[35]

---

[32] While the problem is particularly serious in California, industry sources note that "[i]n every legal state, the THC percentages printed on product labels are becoming less reliable." Nick Jikomes, *Weed Buyer Beware: THC Inflation is Getting Out of Hand*, Leafly, (August 22, 2022) https://www.leafly.com/news/science-tech/marijuana-thc-inflation-is-getting-out-of-hand

[33] *Id.*

[34] Erik Paulson, et al, *The Inflated THC Crisis Plaguing California Cannabis*, Cannabis Industry Journal (July 28, 2022), https://cannabisindustryjournal.com/feature_article/the-inflated-thc-crisis-plaguing-california-cannabis/

[35] Jan Conway, *Marijuana retail price per gram in the U.S. in 2020, by THC potency*, Statista (September 28, 2022) https://www.statista.com/statistics/1251356/cannabis-retail-price-by-potency-us/

**COMPLAINT**

63.     Because consumers use product labeling like a nutrition label to determine the THC content of purchase candidates,[36] products falsely labeled as containing more THC command premium pricing and market preference.

64.     By misreporting (1) inflated THC potency numbers and/or (2) results involving unlawful contaminants, Defendants and their cohorts have created an unfair market environment where honest and compliant laboratories, such as Plaintiff, are at a significant disadvantage.

65.     This problem is widespread. For example, one study (which Plaintiffs conducted, in part) involving 150 randomly chosen flower samples purchased from California shelves revealed that a significant majority (87%) of the tested California flower products contained at least 10% less THC than labeled, with some showing discrepancies of over 25%, and other cannabis products suffer from similar mislabeling.[37]

66.     The same study found multiple cases of unreported Category I pesticides in some of the analyzed samples at multiple times the legal limit – a significant public health concern.[38]

67.     The same issues and economic conditions are in play for concentrates. Manufacturers of these products also hunt for the highest D9 THC values because wholesale prices for distillate are determined by THC content. As a result, consumers can walk into a dispensary and find concentrates that report more than 99% total cannabinoids (>990mg/g) and contains almost 10% additional terpenes, meaning that the falsified lab results claim ingredients totaling to more than 100%.[39]

68.     The practice of falsely reporting THC concentrations and contaminant levels manifests in "lab shopping," as discussed in the introduction of this Complaint,

---

[36] Lester Black, *America's Pot Labs Have A THC Problem*, FiveThirtyEight (June 29, 2021), https://fivethirtyeight.com/features/americas-pot-labs-have-a-thc-problem/
[37] https://cannabisindustryjournal.com/feature_article/the-inflated-thc-crisis-plaguing-california-cannabis/
[38] *Id.*
[39] *Id.*

**COMPLAINT**

whereby cannabis growers intentionally select testing laboratories that they know will provide certificates of analysis with higher (but inaccurate) reported THC, or else turn a blind eye to safety fails.

69.    The result of "lab shopping" is that honest testing laboratories, which are unwilling to provide false certificates of analysis, become uncompetitive. Less scrupulous laboratories are able to increase their market share at Plaintiffs' expense by their willingness to produce false Certificates of Analysis.

70.    This conspiracy to deceive not only distorts the market but also undermines the regulatory frameworks established to ensure product safety and consumer trust. The Defendants, through their actions, have thus contributed to a market dynamic where veracity and compliance on the part of testing laboratories are punished rather than rewarded, leading to a substantial loss of business for ethical operators like Plaintiffs.

71.    The fraudulent testing practices at the heart of this complaint involve the deliberate manipulation of testing results, either to inflate the THC potency or to hide dangerous contaminants in the products. This manipulation is not a result of mere negligence or error but is a calculated effort to misrepresent the actual makeup of cannabis products. Such practices are alarmingly widespread, as evidenced by reports and investigations within the industry, which have highlighted numerous instances of labs engaging in this deceitful behavior.

72.    The prevalence of these fraudulent activities is not only a testament to their profitability but also an indictment of the existing regulatory oversight, which has been insufficient in deterring or detecting such practices. The Defendants, as part of this broader trend, have played a significant role in perpetuating this fraud, directly harming Plaintiffs by siphoning off their customers.

73.    This pattern of behavior constitutes a clear violation of the Lanham Act, as it involves false or misleading representations of fact in commercial advertising or promotion. By providing artificially high THC results and/or by hiding safety fails,

13

**COMPLAINT**

the Defendants have effectively engaged in false advertising, deceiving consumers and unfairly diverting business away from honest competitors like Plaintiffs.

### C. Harms to Consumers and Competition Traceable to Fraudulent Testing

74.     As described above, DCC regulations require an accurate statement of the THC content of cannabis products on the label and permit a margin of error of 10%.

75.     The labels that display the results of Defendants' testing include a statement of the THC content of their cannabis products that far exceed the true THC content of the products being sold. Moreover, the excess is far greater than the excess allowable under the applicable DCC regulations. Accordingly, Defendants' data, set forth on the product labels, violates DCC regulations in addition to misleading consumers.

76.     Similarly, as discussed in further detail below, multiple Defendants have issued inaccurate COAs for products that are commercially available, but which independent testing reveals have either Category I contaminants, which render them unable to be sold to consumers, full stop; or else they have levels of Category II contaminants that are above what is allowed under DCC regulations, which means that they also are ineligible for public consumption.

77.     In addition, the labels displaying Defendants' test results are false and misleading to consumers, who expect that the labeling of cannabis products is accurate. Consumers also expect that the labels of cannabis products comply with DCC regulations, and so expect that the declared THC content is no more than 10% greater than the true THC content, and that any product on the shelf does not contain prohibited contaminants.

78.     In short, consumers believe that they are receiving a product that has the THC content that is listed on the label, when in fact they are receiving much less. THC is one of the active ingredients in cannabis products, and the one that causes the vast majority of the product's psychological and medicinal effects. Consumers care

**COMPLAINT**

1  about the THC content of cannabis products and decide which cannabis product to

2  buy in large part based on the declared THC content.

3      79.   Further, consumers believe that the cannabis products they buy do not

4  contain contaminants that are prohibited by law, and which must be tested for prior

5  to sale.

6      80.   Defendants' false and misleading labeling data allows brands to charge

7  higher prices for their products, or to sell products that should not be made available

8  to consumers in the first place. As explained above, the THC content drives the sales

9  of cannabis products—including the price at which the products sell for, how quickly

10  they sell, and whether they sell at all.



Fig. 1

Mapping of correlation between THC potency and price in
California cannabis products – from *Dobbins M, Rakkar M,
Cunnane K, Pennypacker SD, Wagoner KG, Reboussin BA and*

15

**COMPLAINT**

*Romero-Sandoval EA (2022) Association of Tetrahydrocannabinol Content and Price in Herbal Cannabis Products Offered by Dispensaries in California: A Purview of Consumers/Patients. Front. Public Health 10:893009. doi: 10.3389/fpubh.2022.893009.*[40]

81.   If Defendants told the truth—that is, that the cannabis products that they help usher into the stream of commerce contain substantially lower THC than represented on the label and/or are adulterated with contaminants—then the price of those products would fall dramatically (or the products would simply not be fit for sale).

### D. Plaintiff ICAL's Experience

82.   Plaintiff ICAL is a licensed testing laboratory in California which was founded in 2016 by two PhD chemists for the purpose of providing accurate testing to the cannabis and hemp industries.

83.   Plaintiff's business was successful, and ultimately expanded to a team of more than 30 scientists in a large laboratory.

84.   However, Plaintiff's business has been severely impacted by the practice of lab shopping, as Plaintiff's customers (who themselves feel competitive pressure from THC potency inflation) are drawn away by labs willing to provide COAs reflecting higher but inaccurate THC levels.

85.   On more than one occasion, Plaintiff ICAL has been approached by a potential client who, prior to even providing a sample for testing, has demanded a specific THC potency to be guaranteed.  When Plaintiff refused to guarantee a lab result prior to testing (*i.e.*, prior to being supported by empirically verifiable methodology), the brand(s) then commenced to lab shop and find laboratories (including but not limited to Defendants) who then provided the desired results.

86.   Similarly, in such conversations, it was implied that Plaintiff ICAL would turn a blind eye to safety fails, in the event of the presence of harmful contaminants.

---

[40] Available at
https://www.researchgate.net/publication/361368975_Association_of_Tetrahydrocannabinol_Content_and_Price_in_Herbal_Cannabis_Products_Offered_by_Dispensaries_in_California_A_Purview_of_ConsumersPatients#pf4

**COMPLAINT**

Plaintiff's refusal to do so was another motivating factor in clients seeking out other, less scrupulous laboratories (including but not limited to Defendants).

87. To date, Plaintiff ICAL has lost significant business due to its refusal to inflate THC potency, or to otherwise alter any test results or customers.

### E. Plaintiff Anresco's Experience

88. Plaintiff Anresco is a licensed testing laboratory in California which was founded in 1943. Among other specialties, Anresco is dedicated to providing accurate testing to the cannabis and hemp industries.

89. Plaintiff's business was successful, and ultimately expanded to a team of more roughly 80 employees.

90. However, Plaintiff's business has been severely impacted by the practice of lab shopping, as Plaintiff's customers (who themselves feel competitive pressure from THC potency inflation) are drawn away by labs willing to provide COAs reflecting higher but inaccurate THC levels.

91. On more than one occasion, Plaintiff Anresco has been approached by a potential client who, prior to even providing a sample for testing, has demanded a specific THC potency to be guaranteed. When Plaintiff refused to guarantee a lab result prior to testing (*i.e.*, prior to being supported by empirically verifiable methodology), the brand(s) then commenced to lab shop and find laboratories (including but not limited to Defendants) who then provided the desired results.

92. Similarly, in such conversations, it was implied that Plaintiff Anresco would turn a blind eye to safety fails, in the event of the presence of harmful contaminants. Plaintiff's refusal to do so was another motivating factor in clients seeking out other, less scrupulous laboratories (including but not limited to Defendants).

93. To date, Plaintiff Anresco has lost significant business due to its refusal to inflate THC potency, or to otherwise alter any test results or customers.

### F. Defendants' Specific Conduct

94.     Each Defendant named herein either is a lab that has provided fraudulent test results resulting either in inflated THC potency or else a false negative for a safety fail.

95.     The allegations as to each Defendant are established by independent testing.

#### i. Defendants Engaging in THC Potency Inflation

##### 1. Bel Costa Labs

96.     Defendant Bel Costa Labs has provided at least one COA with inflated THC potency outside of the allowable margin of error, as follows:

    a.  Brand Tested: Glass House Camarillo

    b.  Product Tested: Chocolate Flambe

    c.  Labeled Total THC: 20.08% THC (COA)

    d.  Independent Test Result: 14.02% THC

    e.  THC Inflation Range: 43%

##### 2. Landau Labs

97.     Defendant Landau Labs has provided at least one test result with inflated THC potency outside of the allowable margin of error, as follows:

    a.  Brand Tested: Zips!

    b.  Product Tested: Original Glue

    c.  Labeled Total THC: 24.36% THC (Label Claim)

    d.  Independent Test Result: 16.51% Total THC

    e.  THC Inflation Range: 50%

##### 3. Encore Labs

98.     Defendant Encore Labs has provided at least one test result with inflated THC potency outside of the allowable margin of error, as follows:

    a.  Brand Tested: THC Design

    b.  Product Tested: Unicornz - 3.5 g

c. Labeled Total THC: 25.92% THC (Label claim)

d. Independent Test Result: 18.25% Total THC

e. THC Inflation Range: 42%

### 4. CC Testing Labs

99. Defendant CC Testing Labs has provided at least one COA with inflated THC potency outside of the allowable margin of error, as follows:

a. Brand Tested: Fog City Farms

b. Product Tested: Shark Bite - Pacific Chemistry

c. Labeled THC: 40.56% Total THC (COA)

d. Independent Test Result: 34.24% Total THC

e. THC Inflation Range: 18%

### 5. Green Leaf Lab

100. Defendant Green Leaf Lab has provided at least one test result with inflated THC potency outside of the allowable margin of error, as follows:

a. Brand Tested: Tyson 2.0

b. Product Tested: Exodus Private Reserve - 3.5 g

c. Labeled Total THC: 43.66% THC (Label Claim)

d. Independent Test Result: 29.71% Total THC

e. THC Inflation Range: 47%

### 6. Harrens Lab Inc.

101. Defendant Harrens Lab Inc. has provided at least one COA with inflated THC potency outside of the allowable margin of error, as follows:

a. Brand Tested: Pure Beauty

b. Product Tested: Sativa Babies Mini Pre-Roll

c. Labeled Total THC: 24.36% THC (COA)

d. Independent Test Result: 19.43% THC

e. THC Inflation Range: 25%

19

**COMPLAINT**

### 7. Caligreen

102. Defendant Caligreen has provided at least one COA with inflated THC potency outside of the allowable margin of error.

103. For example, throughout 2023, Caligreen manipulated multiple tests of cannabis products, in order to inflate the potency of THC on the products' respective labels. Defendant subsequently was the subject of regulatory action from the DCC, receiving a citation, fine, and order of abatement issued on or about April 15, 2024. A copy of the notice from the DCC is attached hereto as **Exhibit 1**.

104. Per the DCC, Caligreen committed multiple violations in furtherance of its efforts to alter its testing results, for its client(s).

105. **Violation 1 (Cal. Code Regs. tit. 4, § 15729(a)(2)):** Per the DCC, "[d]uring review of the chromatographic raw data for sample 2308CGL2297.5733, Department Staff observed that the cannabichromene (CBC) and Tetrahydrocannabinolic acid (THCA) peaks in the Continuing Calibration Verifications (CCV) were not split consistently and appropriately. Laboratory employees must be trained in identifying when the instrument does not properly integrate analytes of interest as part of GLP. Failure to identify that the instrument did not consistently integrate the peaks indicates issues with the instrument method and also with employee training. Caligreen Laboratory failed to comply with the LQA program objectives for GLP required by California Code of Regulations, title 4, section 15729, subdivision (a)(2)." Ex. 1 at p. 2.

106. **Summary of DCC violation:** The laboratory was not analyzing their quality control samples properly according to established best practices and regulations. The purpose of these quality control samples is to confirm that their instruments and methods are suitable for use on a continuing basis and can result in accurate and quality data. Improper peak splitting of CBC and THCA indicates that they were not accurately quantifying these two cannabinoids, and that their laboratory employees were not properly trained to do so in either quality control samples, or

actual client samples. Proper validation of instruments and methods, analysis of quality control samples, and employee training and qualifications are all requirements of Laboratory Quality Assurance program required by regulations, and the laboratory failed to comply with these requirements.

107. **Violation 2 (Cal. Code Regs. tit. 4, § 15729(a)(3)):** Per the DCC "[u]pon review of the data package submitted for samples 2307CGL2117.5209 and 2307CGL2125.5231, Department Staff observed that the integrations for Tetrahydrocannabinolic Acid (THCA) within the Continuing Calibration Verification (CCV) were not consistent. Inconsistent and manual integrations indicate problems with the measurement and traceability of instrument data including analytical results as well as training and data calculations. Caligreen Laboratory failed to comply with the LQA objectives for measurement data required by California Code of Regulations, title 4, section 15729, subdivision (a)(3)." *Id.* at 2-3.

108. **Summary of DCC violation:** Integrations are used to calculate the peak area of a chromatographic peak, which are then used to calculate the concentration of an analyte of interest. All data should be integrated consistently in standards, samples and QC samples. The laboratory was not properly and consistently integrating peaks in the analysis of required quality control samples according to regulatory guidelines and best practices, which is indicative of a systemic issue of the quality and accuracy of the lab's data.

109. **Violation 3 (Cal. Code Regs. tit. 4, §§ 15726(b), (d); § 15037(c); and § 15724):** Per the DCC "Caligreen Laboratory failed to report the actual results of the cannabinoid testing, and instead reported inaccurate testing results. Samples previously analyzed by Caligreen Laboratory were subsequently analyzed by the Department's Cannabis Testing Laboratory Branch (CTLB). CTLB's results and the true values were found to differ significantly from the values reported by Caligreen Laboratory. The results for ten (10) samples found to differ significantly are expressed in Table 1 below…. The integrity of label claims and other required testing results are

**COMPLAINT**

challenged when compliance testing samples do not align with samples collected from other licensees such as distributors or retailers. Reported values by Caligreen Laboratory are beyond a reasonable amount of variance from both the laboratory's reserve section and samples collected from retail…. Moreover, the results from the ten (10) samples identified in Table 1 [below] were randomly selected by the Department from COAs issued by Caligreen Laboratory between April 2023 through August 2023. All ten (10) samples tested by CTLB were found to be inflated, as shown in the table above. The test results demonstrate that over the course of a five-month period, Caligreen Laboratory engaged in a repeated pattern of reporting inaccurate and inflated cannabinoid results…. Caligreen Laboratory failed to comply with California Code of Regulations, title 4, sections 15037, subdivision (c), 15724 and 15726, subdivisions (b) and (g), by reporting inaccurate Total THC results for cannabinoids and failing to ensure the accuracy and validity of those results on the sample COA." *Id.* at 3-4.

| Analyte | Caligreen Sample ID | Sample METRC UID | Caligreen Value (mg/g dry) | CTLB Value (mg/g dry) | Difference in percent |
|---|---|---|---|---|---|
| Total THC | 2307CGL2125.5231 | 1A406030001FC35000000763 | 331.27 | 247 | 25.44 |
| | 2308CGL2383.5934 | 1A406030001FC35000000768 | 324.56 | 235 | 27.59 |
| | 2308CGL2464.6148 | 1A406030001FC35000000769 | 331.88 | 252 | 24.07 |
| | 2304CGL0985.2571 | 1A40603000160BD000000532 | 283.40 | 224 | 20.96 |
| | 2307CGL2117.5209 | 1A40603000160BD000000594 | 337.26 | 276 | 18.16 |
| | 2308CGL2297.5733 | 1A40603000067EB000049320 | 872.40 | 780 | 10.59 |
| | 2307CGL2115.5204 | 1A40603000048AE000006922 | 308.55 | 237 | 23.19 |
| | 2307CGL2116.5205 | 1A40603000099EE000012417 | 344.46 | 249 | 27.71 |
| | 2304CGL1171.3047 | 1A4060300046CCD100000205 | 236.95 | 181 | 23.61 |
| | 2308CGL2535.6388 | 1A40603000483170000000605 | 334.18 | 258 | 22.80 |

*Table 1 - Comparison of concentrations from Caligreen Laboratory against CTLB*

110. **Summary of DCC violation:** There was a systematic overreporting of THC content by the laboratory, as confirmed by the DCC Cannabis Testing Laboratory Branch (CTLB), which had pulled samples from the laboratory retain as

well as the retail shelf between April and August of 2023. The reported Caligreen values for the flower samples (Samples 1-5, 7-10) were between 18-28% higher than the DCC laboratory's results for the same samples. An additional concentrate sample (Sample 6, Sample ID 2308CGL2297.5733), was just over 10% higher than the DCC CTLB result.

### 8. Decano Analytical Laboratories

111. Defendant Decano Analytical Laboratories has provided at least one COA with inflated THC potency outside of the allowable margin of error.

112. For example, throughout 2023, Decano Analytical Laboratories manipulated multiple tests of cannabis products, to inflate the potency of THC on the products' respective labels. Defendant subsequently was the subject of regulatory action from the DCC, receiving a citation, fine, and order of abatement issued on or about October 19, 2023. A copy of the notice from the DCC is attached hereto as **Exhibit 2**.

113. Per the DCC, Decano Analytical Laboratories committed multiple violations in furtherance of its efforts to alter its testing results, for its client(s). These include, but are not limited to, the following:

114. **Violation of Cal. Code Regs. tit. 4, § 15726(b); § 15037(c); and § 15724:** Per the DCC, Decano Analytical Laboratories "failed to report the actual results of the cannabinoid testing, and instead reported inaccurate testing results. Samples previously analyzed by the laboratory were subsequently analyzed at the Department's reference laboratory, DCC Cannabis Testing Laboratory Branch, Richmond, California (CTLB [*sic*] and the true values were found to differ significantly from the values reported by the laboratory." Ex. 2 at p. 5.

115. Specifically, the DCC engaged in its own independent testing and found THC potency inflation, but the agency also cited to separate results from a third-party lab, which also found potency inflation:

**COMPLAINT**

| Analyte | Sample ID | VK Labs ID | VK Labs Value (mg/g dry) | CTLB Value (mg/g dry) | Difference in percent (%) |
|---------|-----------|-----------|--------------------------|-----------------------|---------------------------|
| THCa | F2307016-001 | 2302DEC0053.0099 | 375.508 | 196 | 91.6 |
|  | F2307016-002 | 2304DEC0238.0517 | 382.04 | 243 | 57.2 |
|  | F2307016-003 | 2304DEC0253.0541 | 362.498 | 258 | 40.5 |
|  |  |  |  |  |  |
| D9-THC | F2307016-001 | 2302DEC0053.0099 | 9.259 | 53.9 | 82.8 |
|  | F2307016-002 | 2304DEC0238.0517 | 21.612 | 42.1 | 48.7 |
|  | F2307016-003 | 2304DEC0253.0541 | 14.852 | 34.5 | 57.0 |
|  |  |  |  |  |  |
| Total THC | F2307016-001 | 2302DEC0053.0099 | 338.579 | 226 | 49.8 |
|  | F2307016-002 | 2304DEC0238.0517 | 356.658 | 255 | 39.9 |
|  | F2307016-003 | 2304DEC0253.0541 | 332.763 | 260 | 28.0 |

Table 1 – Comparison of concentrations from VK Labs against CTLB.

Fig. 3 – DCC Testing Finding THC Potency Inflation

| Analyte | Sample Metrc UID | VK Labs ID | VK Labs Value (% dry) | Third-Party Value (% dry) | Difference in percent (%) |
|---------|------------------|-----------|-----------------------|---------------------------|---------------------------|
| Total THC | 1A4060300010F7D000023720 | 2301DEC0009.0018 | 28.65 | 14.35 | 99.7 |
|  | 1A4060300010F7D000023721 | 2301DEC0009.0019 | 29.67 | 18.20 | 63.0 |
|  | 1A4060300010F7D000029551 | 2304DEC0257.0546 | 34.28 | 27.63 | 24.1 |
|  | 1A4060300010F7D000030137 | 2305DEC0285.0598 | 35.32 | 27.34 | 29.2 |
|  | 1A4060300010F7D000030137 | 2305DEC0285.0598 | 35.32 | 27.10 | 30.3 |
|  | 1A40603000064CA000000691 | 2305DEC0330.0706 | 30.76 | 18.37 | 67.4 |
|  | 1A4060300010F7D000033633 | 2306DEC0416.0913 | 33.73 | 22.14 | 52.4 |

Table 2 – Comparison of concentrations from VK Labs against Third-party laboratory testing.

Fig. 4 – Third Party Testing Finding THC Potency Inflation

116. **Summary of DCC violation:**  A set forth in the above tables, Decano Analytical Laboratories provided test results that inflated the THC potency of the products at issue beyond the margin of error allowed under DCC regulations.

## ii.  Defendants Failing to Report Contaminants in COAs

### 1.  Excelbis Labs

117. Defendant Excelbis Labs has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product.  Proper testing would have identified these substances and would have rendered them unfit for sale.  The respective products and their contaminants are as follows:

**COMPLAINT**

### i.     West Coast Cure – Apple Burst

- Product Name: Apple Burst
- Brand:  West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (19x limit); and Trifloxystrobin (231x limit)

### ii.     West Coast Cure – Birthday Cake

- Product Name: Birthday Cake
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (3x limit); and Trifloxystrobin (10x limit)

### iii.     West Coast Cure – Biscotti

- Product Name: Biscotti
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (2x limit); and Trifloxystrobin (9x limit)

### iv.     West Coast Cure – Bubba Kush

- Product Name: Bubba Kush
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Bifenazate (25x limit); Trifloxystrobin (234x limit); Imidacloprid (1.5x limit)

### v.     West Coast Cure – Gas OG

- Product Name: Bubba Kush
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol

25

**COMPLAINT**

- Category II Contaminant(s): Bifenazate (19x limit); Trifloxystrobin (228x limit); Tebuconazole (slightly over limit)

### vi.    West Coast Cure – Jack Herer

- Product Name: Jack Herer
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (3x limit); Trifloxystrobin (10x limit)

### vii.    West Coast Cure – Lucky Charmz

- Product Name: Lucky Charmz
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Bifenazate (2x limit); Trifloxystrobin (16x limit)

### viii.    West Coast Cure – Strawberry Cream

- Product Name: Strawberry Cream
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (21x limit); Trifloxystrobin (224x limit)

### ix.    West Coast Cure – CUREpen - Birthday

- Product Name: CUREpen - Birthday
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (7x limit)

### x.    West Coast Cure – CUREpen - Gelato

- Product Name: CUREpen - Gelato
- Brand: West Coast Cure

26

**COMPLAINT**

- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (5x limit)

### xi.   West Coast Cure – CUREpen – Jack Herer

- Product Name: CUREpen – Jack Herer
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Bifenazate (slightly over limit); Trifloxystrobin (10x limit)

### xii.   West Coast Cure – CUREpen – Lemon Cooler

- Product Name: CUREpen – Lemon Cooler
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (4x limit)

### xiii.   West Coast Cure – CUREpen – Watermelon Sorbet

- Product Name: CUREpen – Watermelon Sorbet
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (4x limit)

### xiv.   West Coast Cure – Apple Burst CUREpen Cartridge – 1g

- Product Name: Apple Burst CUREpen Cartridge – 1g
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (12x limit); Trifloxystrobin (13x limit)

27

**COMPLAINT**

### xv. West Coast Cure – Jack Herer CUREpen Cartridge – 1g

- Product Name: Jack Herer CUREpen Cartridge – 1g
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (3x limit); Trifloxystrobin (11x limit)

### xvi. West Coast Cure – Lucky Charmz CUREpen Cartridge – 1g

- Product Name: Lucky Charmz CUREpen Cartridge – 1g
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Bifenazate (3x limit); Trifloxystrobin (11x limit)

### xvii. West Coast Cure – Biscotti CUREpen Cartridge – 1g

- Product Name: Biscotti CUREpen Cartridge – 1g
- Brand: West Coast Cure
- Category I Contaminant(s): N/A
- Category II Contaminant(s): Myclobutanil (2x limit)

### xviii. Phire – Cranberry Crush Distillate Cartridge - 1g

- Product Name: Cranberry Crush Distillate Cartridge - 1g
- Brand: Phire
- Category I Contaminant(s): Chlorfenapyr; Fipronil
- Category II Contaminant(s): N/A

### xix. Phire – Pineapple Gelato Distillate Cartridge - 1g

- Product Name: Pineapple Gelato Distillate Cartridge - 1g
- Brand: Phire

**COMPLAINT**

- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): N/A

### 2. Verity Analytics

118.  Defendant Verity Analytics has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product.  Proper testing would have identified these substances and would have rendered them unfit for sale.  The respective products and their contaminants are as follows:

#### i.    West Coast Cure – Blue Dream

- Product Name: Blue Dream
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (5x limit)

#### ii.    West Coast Cure – Maui Waui

- Product Name: Blue Dream
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (5x limit)

#### iii.    West Coast Cure – Orange Cookies

- Product Name: Orange Cookies
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (4x limit)

#### iv.    West Coast Cure – Zkittles

- Product Name: Zkittles
- Brand: West Coast Cure
- Category I Contaminant(s): Chlorfenapyr; Paclobutrazol
- Category II Contaminant(s): Trifloxystrobin (5x limit)

29

**COMPLAINT**

### v.     Phat Panda – Dutch Treat

- Product Name: Dutch Treat
- Brand: Phat Panda
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Malathion (14x limit)

### vi.     Phat Panda – Grand Daddy Purple

- Product Name: Grand Daddy Purple
- Brand: Phat Panda
- Category I Contaminant(s): N/A
- Category II Contaminant(s): Malathion (5x limit)

### vii.     Phat Panda – Original Glue

- Product Name: Original Glue
- Brand: Phat Panda
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): Malathion (14x limit)

### viii.     Phat Panda – Raspberry x Skywalker

- Product Name: Raspberry x Skywalker
- Brand: Phat Panda
- Category I Contaminant(s): N/A
- Category II Contaminant(s): Malathion (14x limit)

### ix.     Phat Panda – Tropical Trainwreck

- Product Name: Tropical Trainwreck
- Brand: Phat Panda
- Category I Contaminant(s): N/A
- Category II Contaminant(s): Malathion (8x limit)

### x.     Phat Panda – Original Glue Cartridge – 1g

- Product Name: Original Glue Cartridge – 1g
- Brand: Phat Panda

**COMPLAINT**

- Category I Contaminant(s): N/A
- Category II Contaminant(s): Malathion (14x limit)

### xi. Phat Panda – Washington Apple Cartridge – 1g

- Product Name: Washington Apple Cartridge – 1g
- Brand: Phat Panda
- Category I Contaminant(s): N/A
- Category II Contaminant(s): Malathion (4x limit); Myclobutanil (2x limit)

### xii. Flavorade – Biscotti x Sherb

- Product Name: Biscotti x Sherb
- Brand: Flavorade
- Category I Contaminant(s): Chlordane
- Category II Contaminant(s): N/A

### xiii. Flavorade – Rainbow Sherbet

- Product Name: Rainbow Sherbet
- Brand: Flavorade
- Category I Contaminant(s): Chlordane
- Category II Contaminant(s): N/A

### xiv. Flavorade – Snowman

- Product Name: Snowman
- Brand: Flavorade
- Category I Contaminant(s): Chlordane
- Category II Contaminant(s): N/A

119. Verity Analytics has been the subject of no fewer than three DCC citations—attached hereto as **Exhibits 3-5**—which ultimately concluded with the suspension, by the DCC, of Verity's provisional license, on April 19, 2024. *See,* Ex. 5.

**COMPLAINT**

### 3. Landau Labs

120. Defendant Landau Labs has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product. Proper testing would have identified these substances and would have rendered them unfit for sale. The respective products and their contaminants are as follows:

#### i.    CRU – Tropicana Cookies

- Product Name: Tropicana Cookies
- Brand: CRU
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): N/A

#### ii.    CRU – Apple Gelato DVP - 1g

- Product Name: Apple Gelato DVP - 1g
- Brand: CRU
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): N/A

#### iii.    CRU – Tropicana Cookies DVP - 1g

- Product Name: Tropicana Cookies DVP - 1g
- Brand: CRU
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): N/A

#### iv.    CRU – Mai Tai DVP - 1g

- Product Name: Mai Tai DVP - 1g
- Brand: CRU
- Category I Contaminant(s): Chlorfenapyr
- Category II Contaminant(s): N/A

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### 4. CC Testing

121. Defendant CC Testing has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product. Proper testing would have identified these substances and would have rendered them unfit for sale. The respective products and their contaminants are as follows:

### i. Fog City Farms – Pacific Chemistry Rosin Infused Pre-Roll - 1.4g

- Product Name: Pacific Chemistry Rosin Infused Pre-Roll - 1.4g
- Brand: Fog City Farms
- Category I Contaminant(s): N/A
- Category II Contaminant(s): Piperonyl Butoxide (3x limit); Spiromesifen (10x limit)

#### 5. 2 Rivers Labs

122. Defendant 2 Rivers Labs has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product. Proper testing would have identified these substances and would have rendered them unfit for sale.

123. For example, throughout 2022, 2 Rivers Labs manipulated multiple tests of cannabis products, in order to disguise the presence of contaminants. Defendant subsequently was the subject of regulatory action from the DCC, receiving a citation, fine, and order of abatement issued on or about May 23, 2023. A copy of the notice from the DCC is attached hereto as **Exhibit 6**.

124. Per the DCC, 2 Rivers Lab committed multiple violations in furtherance of its efforts to alter its testing results, for its client(s).

125. **Violation 1 (Cal. Code Regs. tit. 4, § 15730(a)):** Per the DCC, "[o]n March 17, 2022, the licensed laboratory failed to complete and document the practice of preparing a new, different laboratory replicate sample when its results were not in

33

**COMPLAINT**

concurrence with its partner sample during analysis of sample 2RL-220314-055. Laboratory records reviewed by Department staff during the inspection on January 19, 2023, showed repeated analysis of a duplicate sample in an attempt to achieve values that met acceptance criteria. The laboratory failed to document the repreparation and reanalysis." Ex. 6 at p. 2.

126.  **Summary of DCC violation:**  As part of the list of quality control (LQC) samples that regulations require laboratories to include in each analytical batch, the laboratories must prepare and run a replicate sample in duplicate. The replicate preparation is used to verify that the preparation and analysis process can be performed with an acceptable amount of precision.

127.  **Violation 2 (Cal. Code Regs. tit. 4, § 15730(f) / Cal. Code Regs. tit. 4, § 15730(h)):**  Per the DCC, "[t]he licensed laboratory failed to remedy failing LQC values in an appropriate manner. During the November 30, 2022, review of pesticide analysis for sample 2RL-221116-08 it was discovered that two LCS samples were included and neither had passed criteria for all analytes. Additionally, aflatoxin G2 and cyfluthrin had been integrated manually to achieve a passing result. During the November 30, 2022, review of pesticide analysis for sample 2RL-220908-067 it was discovered that in the LCS several analytes including azoxystrobin, boscalid, dimethomorph, and spinosad D, were manually modified to achieve a passing result. During the November 30, 2022, review of pesticide analysis for sample 2RL-221109-005 it was discovered that the continuing calibration verification (CCV) had failed for spinosad D, been reinjected, failed again and the run should not have been reported. Also, in that same run the LCS failed for spinosad D and for spinetoram L. During the January 25, 2023, review of pesticide analysis for sample 2RL-220316-021 it was discovered that the LCS had failed for Spinosad and spinetoram and the run should not have been reported….The licensed laboratory failed to remedy failing LQC values in an appropriate manner. During review of the heavy metals analysis for sample 2RL-221220-062 it was noted that the CCV had failed for mercury several

times with under 70% recovery. The percent recovery of the CCV is required to be between 70-130%. The laboratory analyzed the CCV 15 times because the sample's results were consistently below the 70% recovery threshold. The provided records only discuss four to six CCV samples analyzed depending on the quantity of compliance testing samples in the batch." *Id.* at 2-3.

128.  **Summary of DCC violation:**  On multiple occasions, the laboratory did not adhere to their quality assurance program, which requires the laboratory to include laboratory quality control (LQC) samples in analysis batches that meet certain criteria in order to validate the results of the samples in the batch. The LQC samples were included in the batch, but were either manipulated or re-ran to achieve passing results. The manipulation of LQC samples can call into question the validity of the test results associated with the samples in those batches.

### 6.  Certified Ag Labs

129.  Defendant Certified Ag Labs has provided at least one COA that failed to accurately test for the presence of Category I and/or Category II contaminants for a cannabis product.  This resulted in the lab having its provisional license suspended for 60 days, as of February 1, 2024, following regulatory action from the DCC.  A copy of the notice from the DCC is attached hereto as **Exhibit 7**.

130. Per the DCC, Certified Ag Lab committed multiple violations in furtherance of its efforts to overlook the presence of mycotoxins and residual pesticides, for its client(s).

131.  Specifically, the DCC found that Certified Ag Labs had failed to satisfy numerous requirements for licensure, related to its failure to sufficiently analyze samples for the presence of mycotoxins and residual pesticides: "[o]n October 23, 2023, Certified Ag Labs provided an incomplete certificate of accreditation. The certificate number 6099.01 and corresponding scope, issued by accrediting body A2LA to Certified Ag Labs on April 25, 2023, is missing required test methods and required analytes for Residual Pesticides and Mycotoxins." Ex. 7 at p. 2.

**COMPLAINT**

132.  Similarly, "[o]n December 20, 2023 Certified Ag Labs [reported to the DCC] that the certificate of accreditation for Mycotoxins and Residual Pesticides test methods was delayed due to Certified Ag Labs not purchasing the required secondary standards needed for accreditation. Secondary standards are also required for the analysis of an Initial Calibration Verification in the Mycotoxins and Residual Pesticides test methods pursuant to 4 CCR 15713(c)(1)(D)(ii). Certified Ag Labs also stated that the SOP for the cannabinoids test method ("SOP 420 HPLC Analysis of Cannabinoids") including the missing cannabinoid analyte, THCV, had been resubmitted to their accrediting body, A2LA, for expanded scope of accreditation consideration. Certified Ag Labs also notified the Department that the Terpenoids test method was not intended for reporting regulatory compliance samples and is not intended for inclusion in the current scope of their testing license or accreditation." *Id*. at 3.

133.  "Additionally on December 20 2023 [*sic*], Certified Ag Labs provided 9 method validation reports for the following test methods: Heavy Metals, Microbial Impurities, Moisture Content, Mycotoxins, Residual Pesticides, Cannabinoids, Residual Solvents, Terpenoids, and Water Activity. The method validation reports for Heavy Metals, Mycotoxins, Residual Pesticides, Cannabinoids, Residual Solvents, and Terpenoids were incomplete. Certified Ag Labs did not provide the required certified reference material analysis to validate the following chemical test methods: Cannabinoids (non-flower matrices, if available), Heavy Metals, Mycotoxins, Residual Pesticides, Residual Solvents, and Terpenoids (if available)." *Id*.

134.  **Summary of DCC violation:**  Laboratories that are licensed by the Department of Cannabis Control are required to maintain ISO/IEC 17025 Accreditation, an internationally recognized standard for the accreditation of analytical testing laboratories. The accreditation scope must include all of the testing methods that the lab performs. Certified Ag failed to meet this requirement with regards to their Residual Pesticides and Mycotoxins method, and for analytes

included in their cannabinoid potency method. Since Certified Ag provided method validations to the DCC for the scope of their testing which did not meet these requirements for method validations, it indicated that they were using methods of testing that had not been properly validated and could result in misreporting of results.

### 7. Encore Labs

135. Defendant Encore Labs has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product. Proper testing would have identified these substances and would have rendered them unfit for sale.

136. For example, throughout 2022, Encore Labs manipulated multiple tests of cannabis products, in order to disguise the presence of contaminants. Defendant subsequently was the subject of regulatory action from the DCC, receiving a citation, fine, and order of abatement issued on or about August 16, 2023. A copy of the notice from the DCC is attached hereto as **Exhibit 8**.

137. Per the DCC, Encore Labs committed multiple violations in furtherance of its efforts to alter its testing results, for its client(s).

138. **Violation 1 (Cal. Code Regs. tit. 4, § 15730(e)):** Per the DCC, "Encore Labs LLC (Encore Labs) did not prepare and analyze the Continuing Calibration Verification (CCV) sample as required under California Code of Regulations, title 4, section 15730, subdivision (e). As defined in California Code of Regulations, title 4, section 15700, subdivision (r), a CCV means a type of quality control sample that includes all the target method analytes in concentration that is a mid-range calibration standard which checks the continued validity of the calibration of the instrument. Pursuant to California Code of Regulations, title 4, section 15730, subdivision (f), the acceptance criteria for a valid CCV must have results with a percent recovery between 70% to 130% of the expected value. If a CCV produces results outside of acceptance criteria, the laboratory is prohibited from reporting the result and the entire batch cannot be released for retail sale. The laboratory must determine the cause of the

**COMPLAINT**

results falling outside of the acceptance criteria and take steps to remedy the problem until the result is within the specified acceptance criteria. For all samples observed and reviewed, including but not limited to sample 2208ENC7241_3218 and sample 2208ENC7448_3792, when reporting the results of residual pesticides testing, Encore Labs reported batch results with a CCV that was prepared and analyzed along with a secondary spiked CCV sample identified as "CCV Adjust." Encore Labs used both the CCV and CCV Adjust samples to establish an acceptance criteria that differs from the acceptance criteria established by the Department's regulations, based on comparing spike recovery or yield between the two samples. By establishing an alternate non-compliant acceptance criteria, Encore Labs did not analyze a CCV as required by the Department's regulations. The process of adjusting the CCV for the residual pesticides method provides results that do not meet acceptance criteria specified in the Departments regulations and does not capture the true value of the CCV sample. Encore Labs did not prepare and analyze the CCV appropriately pursuant to California Code of Regulations, title 4, section 15730, subdivision (e)." Ex. 8 at pp. 2-3.

139. Further, "Encore Labs failed to comply with laboratory testing requirements by failing to calculate percent recovery accurately and properly for the CCV. For samples 2208ENC7241_3218 and sample 2208ENC7448_3792, when testing and reporting the results of residual pesticides, Encore Labs failed to calculate percent recovery accurately or properly for the CCV. Encore Labs did not use a percent recovery calculation as required by the Department's regulations, and instead used a non-compliant calculation when reporting the following pesticides: acequinocyl (CAS No. 57960-19-7), captan (CAS No. 133-06-2), chlordane (CAS No. 57-74-9); chlorfenapyr (CAS No. 122453-73-0); cyfluthrin (CAS No. 68359-37-5); cypermethrin (CAS No. 52315-07-8); methyl parathion (CAS No. 298-00-0); and pentachloronitrobenzene (CAS No. 82-68-8). Encore Labs used a non-compliant calculation which compared a measured concentration for the CCV with the measured

concentration for the CCV Adjust sample. The CCV Adjust sample result is the divisor of the expected (added) spiked amount for the second adjust sample. The quotient is then multiplied by the measured concentration of the CCV sample. The product is then divided by the expected concentration of the CCV multiplying the quotient by 100. Regulations require licensed testing laboratories to calculate percent recovery pursuant to California Code of Regulations, title 4, section 15700, subdivision (rr) to satisfy requirements in method validation described in California Code of Regulations, title 4, section 15713. Regulations require licensed testing laboratories to calculate percent recovery pursuant to California Code of Regulations, title 4, section 15700, subdivision (rr) to satisfy requirements in Proficiency Testing described in California Code of Regulations, title 4, section 15733." *Id.* at 3-4.

140. Further, "Encore Labs did not implement Good Laboratory Practice (GLP) and act in accordance with their laboratory quality assurance program to assure the reliability and validity of the analytical data produced including appropriate interpretation of the data pursuant to California Code of Regulations, title 4, section 15729, subdivision (a). Encore Labs intentionally engaged in using inappropriate quality assurance practices jeopardizing the integrity of residual pesticides testing to minimize quality control sample failure and other subsequent responses such as maintenance, re-calibration, and other logistical challenges. The following Category I Residual Pesticides were analyzed inappropriately as a direct result of improper CCV analysis: chlordane (CAS No. 57-74-9); chlorfenapyr (CAS No. 122453-73-0); and methyl parathion (CAS No. 298-00-0). These actions present a risk to public health and safety by delaying corrective actions and inaccurately reporting both Category I and Category II Residual Pesticides. These actions present a risk to public health and safety by avoiding risk mitigation of a failing calibration." *Id.* at 4.

141. Finally, "[t]he Department reviewed data packages and Regulatory Compliance Testing COAs for the following samples that were reported as passing batches for residual pesticides testing where Encore Labs did not properly prepare

and analyze the CCV: sample 2208ENC7241_3218, tested on August 24, 2022; sample 2208ENC7448_3792, tested on August 30, 2022; sample 2209ENC7676_4572, tested on September 8, 2022; and sample 2209ENC7768_4959, tested on September 12, 2022. The Department observed improper percent recovery in use for samples analyzed on the date of the inspection September 20, 2022." *Id*. at 4-5.

142. **Summary of DCC violation:**  On multiple occasions, the laboratory did not adhere to their laboratory quality assurance program, which requires the laboratory to include laboratory quality control (LQC) samples in analysis batches that meet certain criteria in order to validate the results of the samples in the batch. One such sample is a Continuing Calibration Verification (CCV), which is a solution with known concentration values that is run to ensure the instrumentation used for the analysis is still properly calibrated and able to produce accurate results. The CCV standards were included in the batch, but the results were not valid, as they intentionally used an improper calculation involving additional CCV samples to provide a correction factor. This correction factor took values that would have caused the CCV samples to fail and modified them so that they met acceptance criteria. The manipulation of LQC samples can call into question the validity of the test results associated with the samples in those batches.

143. **Violation 2 (Cal. Code Regs. tit. 4, §§ 15730(d)(2), (f), (h)):** Per the DCC, "Encore Labs did not prepare and analyze the Laboratory Control Sample (LCS) as required under California Code of Regulations, title 4, section 15730, subdivision (d)(2) and (f). As defined in California Code of Regulations, title 4, section 15700, subsection (ff), Laboratory Control Sample (LCS) means a blank matrix to which known concentrations of each of the target method analytes are added, and the spiked concentration must be at a mid-range concentration of the calibration curve for the target analytes. The LCS is analyzed in the same manner as the representative sample for all chemical test methods pursuant to California Code

of Regulations, title 4, section 15730, subdivision (a). The acceptance criteria for a valid LCS must have results with a percent recovery between 70% to 130% of the theoretical or expected value. If a LCS produces results outside of acceptance criteria, the laboratory is prohibited from reporting the result and the entire batch cannot be released for retail sale. The laboratory must determine the cause of the results falling outside of the acceptance criteria and take steps to remedy the problem until the result is within the specified acceptance criteria. For all samples observed and reviewed, including but not limited to sample 2208ENC7241_3218 and sample 2208ENC7448_3792, when reporting the results of residual pesticides testing Encore Labs reported batch results with an LCS that was prepared and analyzed along with a secondary\ spiked LCS sample identified as "LCS Adjust." Encore Labs used both the LCS and LCS Adjust samples to establish an alternative acceptance criteria based on comparing spike recovery or yield between the two samples. An LCS outside of the acceptance criteria required in regulations mean Encore Labs cannot report the result and declare the batch as passing until the root cause for failing LCS is remedied. By establishing an alternate non-compliant acceptance criteria, Encore Labs did not analyze an LCS as required by the Department's regulations. The process of adjusting the LCS for the residual pesticide's method enables a work-around to avoid frequent corrective actions from not meeting acceptance criteria described in California Code of Regulations, title 4, section 15730, subdivisions (d) – (h). Encore Labs did not prepare and analyze the LCS appropriately pursuant to California Code of Regulations, title 4, section 15730, subdivision (d)(2), and (f) through (h)." *Id.* at 5-6.

144. Further, "Encore Labs failed to comply with laboratory testing requirements by failing to calculate percent recovery accurately and properly for the LCS. For samples 2208ENC7241_3218 and sample 2208ENC7448_3792, when testing and reporting the results of residual pesticides, Encore Labs failed to accurately or properly calculate percent recovery for the LCS. Encore Labs did not

use a percent recovery calculation as required by the Department's regulations, and instead used a non-compliant calculation when reporting the following pesticides: acequinocyl (CAS No. 57960-19-7), captan (CAS No. 133-06-2), chlordane (CAS No. 57-74-9); chlorfenapyr (CAS No. 122453-73-0); cyfluthrin (CAS No. 68359-37-5); cypermethrin (CAS No. 52315-07-8); methyl parathion (CAS No. 298-00-0); and pentachloronitrobenzene (CAS No. 82-68-8). Encore Labs used a non-compliant calculation which compared a measured concentration for the LCS with the measured concentration for the LCS Adjust sample. The LCS Adjust sample result is the divisor of the expected (added) spiked amount for the second adjust sample. The quotient is then multiplied by the measured concentration of the LCS sample. The product is then divided by the expected concentration of the LCS multiplying the quotient by 100. Regulations require licensed testing laboratories to calculate percent recovery pursuant to California Code of Regulations, title 4, section 15700, subdivision (rr). Regulations require licensed testing laboratories to calculate percent recovery pursuant to California Code of Regulations, title 4, section 15700, subdivision (rr) to satisfy requirements in Proficiency Testing described in California Code of Regulations, title 4, section 15733." *Id*. at 6.

145. "Encore Labs did not implement Good Laboratory Practice (GLP) and act in accordance with their laboratory quality assurance program to assure the reliability and validity of the analytical data produced including appropriate interpretation of the data pursuant to California Code of Regulations, title 4, section 15729, subdivision (a). Encore Labs intentionally engaged in using inappropriate quality assurance practices jeopardizing the integrity of residual pesticides testing to minimize quality control sample failure and other subsequent responses such as maintenance, re-calibration, and other logistical challenges. The following Category I Residual Pesticides were analyzed inappropriately as a direct result of improper LCS analysis: chlordane (CAS No. 57-74-9); chlorfenapyr (CAS No. 122453-73-0); and methyl parathion (CAS No. 298-00-0). These actions present a risk to public health

and safety by delaying corrective actions and inaccurately reporting both Category I and Category II Residual Pesticides. These actions present a risk to public health and safety by avoiding risk mitigation of a failing calibration." *Id*. at 7.

146. Finally, "[t]he Department reviewed data packages and Regulatory Compliance Testing COAs for the following samples that were reported as passing batches for residual pesticides testing where Encore Labs did not properly prepare and analyze the LCS: sample 2208ENC7241_3218, tested on August 24, 2022; sample 2208ENC7448_3792, tested on August 30, 2022; sample 2209ENC7676_4572, tested on September 8, 2022; and sample 2209ENC7768_4959, tested on September 12, 2022. The Department observed improper percent recovery in use for samples analyzed on the date of the inspection September 20, 2022." *Id*.

147. **Summary of DCC violation:** On multiple occasions, the laboratory did not adhere to their laboratory quality assurance program, which requires the laboratory to include laboratory quality control (LQC) samples in analysis batches that meet certain criteria in order to validate the results of the samples in the batch. One such sample is a Laboratory Control Sample (LCS), which is blank material that is spiked with all analyzed analytes and taken through the entire analytical process. The LCS is prepared and run alongside the samples being analyzed to ensure that the process used to extract and quantify the analytes is satisfactory. The LCS standards were included in the batch, but the results were not valid, as they intentionally used an improper calculation involving additional LCS samples to provide a correction factor. This correction factor took values that would have caused the LCS samples to fail and modified them so that they met acceptance criteria. The manipulation of LQC samples can call into question the validity of the test results associated with the samples in those batches.

148. **Violation 3 (Cal. Code Regs. tit. 4, §§ 15730(h)):** Per the DCC, "[f]or samples 2208ENC7241_3218, 2208ENC7448_3792, 2209ENC7676_4572, and

2209ENC7768_4959, when testing and reporting the results of residual pesticides, Encore Labs failed to accurately or properly calculate percent recovery for quality control samples. Encore Labs did not use a percent recovery calculation as required by the Department's regulations, and instead used a non-compliant calculation when reporting the following pesticides: acequinocyl (CAS No. 57960-19-7), captan (CAS No. 133-06-2), chlordane (CAS No. 57-74-9); chlorfenapyr (CAS No. 122453-73-0); cyfluthrin (CAS No. 68359-37-5); cypermethrin (CAS No. 52315-07-8); methyl parathion (CAS No. 298-00-0); and pentachloronitrobenzene (CAS No. 82-68-8). The non-compliant calculation involved comparing a measured concentration for the CCV with the measured concentration for the CCV Adjust sample. The CCV Adjust sample result is the divisor of the expected (added) spiked amount for the second adjust sample. The quotient is then multiplied by the measured concentration of the CCV sample. The product is then divided by the expected concentration of the CCV multiplying the quotient by 100. The non-compliant calculation was also used to determine recovery for the LCS using the LCS adjust. Regulations require licensed testing laboratories to calculate percent recovery pursuant to California Code of Regulations, title 4, section 15700, subdivision (rr) to satisfy requirements in method validation described in California Code of Regulations, title 4, section 15713. Regulations require licensed testing laboratories to calculate percent recovery pursuant to California Code of Regulations, title 4, section 15700, subdivision (rr) to satisfy requirements in Proficiency Testing described in California Code of Regulations, title 4, section 15733." *Id*. at 7-8.

149. "Encore Labs did not implement Good Laboratory Practice (GLP) and act in accordance with their laboratory quality assurance program to assure the reliability and validity of the analytical data produced including appropriate interpretation of the data pursuant to California Code of Regulations, title 4, section 15729, subdivision (a)." *Id*. at 8.

**COMPLAINT**

150. Finally, "Encore Labs incorporated the non-compliant percent recovery calculation into their Standard Operating Procedure (SOP) for residual pesticides testing. Encore Labs attested on released Regulatory Compliance Testing Certificates of Analysis (COA) that residual pesticides testing was completed following their accepted and reviewed method, procedure, and quality control testing. The Department reviewed data packages and Regulatory Compliance Testing COAs for the following samples that were reported as passing batches for residual pesticides testing using improper percent recovery calculations and invalid testing conditions: sample 2208ENC7241_3218, tested on August 24, 2022; sample 2208ENC7448_3792, tested on August 30, 2022; sample 2209ENC7676_4572, tested on September 8, 2022; and sample 2209ENC7768_4959, tested on September 12, 2022. The Department observed improper percent recovery in use for samples analyzed on the date of the inspection September 20, 2022." *Id.* at 8-9.

151. **Summary of DCC violation:**  The use of the alternative calculations provided by the laboratory and outlined in 146 and 151 were in violation of the DCC regulations, which specify the proper way to perform the percent recovery calculations.

### 8.  Decano Analytical Laboratories

152. Defendant Decano Analytical Laboratories has provided at least one COA that failed to identify the presence of Category I and/or Category II contaminants for a cannabis product.  Proper testing would have identified these substances and would have rendered them unfit for sale.

153. For example, throughout 2023, Decano Analytical Laboratories manipulated multiple tests of cannabis products, in order to disguise the presence of contaminants.  Defendant subsequently was the subject of regulatory action from the DCC, receiving a citation, fine, and order of abatement issued on or about October 19, 2023.  *See,* **Exhibit 2**.

154. Per the DCC, Decano Analytical Laboratories committed multiple violations in furtherance of its efforts to alter its testing results, for its client(s). These include, but are not limited to, the following:

155. **Violation of Cal. Code Regs. tit. 4, § 15713(d)(8)):** Per the DCC, "California Code of Regulations, title 4, section 15713, subdivision (d)(8), requires the licensed Laboratory to submit a new method validation report after changing test parameters such as calibration criteria. Upon inspection conducted on June 14, 2023, Department Environmental Scientist Gabriela Mendiola (Mendiola) observed incomplete analysis and calibration for analytes captan, aflatoxin B2, and ochratoxin. After data package review started on June 20, 2023, Mendiola determined that testing results were published with the same incomplete analysis parameters for captan, aflatoxin B2, and ochratoxin for samples 2304DEC0270.0565, 2305DEC0324.0688, and 2305DEC0356.0758. Mendiola confirmed VK Labs [d/b/a Decano Analytical Laboratories] did not have appropriate qualifier peaks at the calibration levels needed to meet the Limit of Quantitation (LOQ) values listed on the Certificates of Analysis (COA) for captan, aflatoxin B2, and ochratoxin for all three samples. If an analyte cannot be reliably determined at the LOQ level, then the laboratory risks reporting falsely lower values and reporting incorrect results." Ex. 2 at p. 3.

156. "Based on the method validation data most recently submitted on August 30, 2021, aflatoxin B2 and ochratoxin were calibrated to use two qualifying peaks to ensure the quantitation peak represented an analyte of interest. Based on the method validation data most recently submitted on August 30, 2021, captan was calibrated to use four qualifying peaks to ensure the quantitation peak represented an analyte of interest. VK Labs [d/b/a Decano Analytical Laboratories] made a choice to stop using qualifying peaks and did not notify the Department within 5 business days of the change to the test method using the Form 29 Notification and Request Form for Testing Laboratories." *Id*. at 3-4.

**COMPLAINT**

157. Ultimately, the DCC concluded, Defendant "is unable to repeatedly quantify captan, aflatoxin B2 and ochratoxin for regulatory compliance testing including other required analytes aflatoxin B1, aflatoxin G1, and aflatoxin G2." *Id*. at 4.

158. **Summary of DCC violation:**  VK Labs [d/b/a Decano Analytical Laboratories] intentionally manipulated its pesticide and mycotoxin method so that certain analytes would not be found at the LOQs listed on its COAs.  The method used deviated from what was outlined in the method validation data they previously sent to the DCC.  The DCC determined at least one compliance batch they tested would have failed for Category I and/or Category II pesticides had they used the proper method.  In other words, their manipulation of the data allowed contaminated products to be sold to the general public.

159. **Violation of Cal. Code Regs. tit. 4, § 15714(b)(7)):** Per the DCC, "California Code of Regulations, title 4, section 15714, subdivision (b)(7), requires the licensed Laboratory to test each representative sample of cannabis and cannabis product for residual pesticides. Upon the inspection conducted on June 14, 2023, Department Environmental Scientist Mendiola observed incomplete analysis and calibration for chlordane (CAS No. 57-74-9) enabling an inconsistent determination of the presence or absence of chlordane. After data package review started on June 20, 2023, Mendiola confirmed that testing results were published with the same incomplete analysis parameters of chlordane for samples 2304DEC0270.0565, 2305DEC0324.0688, and 2305DEC0356.0758." *Id*. at 4.

160. "In the calibration curve reviewed on June 14, 2023, chlordane was analyzed using two different spatial forms (isomers). Each isomer had a specific concentration listed and VK Labs [d/b/a Decano Analytical Laboratories] determined the analyzed concentration of each isomer based on the isomeric split percentage from the previous batch of vendor reference material. Mendiola observed that the most recent reference material COA did not have the required percentage which showed

**COMPLAINT**

that the laboratory continued with outdated information. Mendiola confirmed VK Labs [d/b/a Decano Analytical Laboratories] was not properly quantifying chlordane for samples 2304DEC0270.0565, 2305DEC0324.0688, and 2305DEC0356.0758. If the laboratory is not properly calculating the concentration of the chlordane isomers in the curve, it could potentially lead to the laboratory integrating only one of the isomers and reporting an incorrect value for chlordane. Chlordane is a Category I pesticide pursuant to California Code of Regulations, title 4, section 15719, subdivisions (b) and (d)(1) where any quantity above the Limit of Detection (LOD) shall be reported as fail. Chlordane being underreported or quantified inaccurately can lead to reporting false negatives or false conditions of lower than LOD." *Id*. at 4-5.

161. Defendant "is unable to repeatedly quantify chlordane for regulatory compliance testing. VK Labs [d/b/a Decano Analytical Laboratories] is using any signal at the expected position or retention time for chlordane which assists with calibration, Initial Calibration Verification (ICV) samples, Continuing Calibration Verification (CCV) samples, and other Laboratory Quality Control (LQC) samples to meet acceptance criteria as defined in California Code of Regulations, title 4, section 15730, subdivision (d), (f)." *Id*. at 5.

162. **Summary of DCC violation:** VK Labs [d/b/a Decano Analytical Laboratories] was unable to accurately test for one of the Category I pesticides on the DCC list of required pesticides, Chlordane. It is possible that if a product tested by the lab had contained the pesticide listed, that it would not have been able to detect it.

**CLAIMS**
**COUNT 1**
**LANHAM ACT FALSE ADVERTISING**
**(15 U.S.C. § 1125(a))**

163. Plaintiff repeats and realleges the above allegations in this Complaint as if set forth fully herein.

48

**COMPLAINT**

164.  Defendants have made false and/or misleading statements in commercial advertising for cannabis products in violation of the Lanham Act, 15 U.S.C. § 1125.

165.  Defendants' statements are literally false and/or likely to deceive a substantial portion of the relevant purchasing public about the true nature, characteristics, and qualities of cannabis products being sold with labels displaying Defendants' test results.

166.  The statements in the labels containing Defendants' data are directed at both dispensaries and consumers of cannabis products, who are actually deceived to the detriment of Plaintiff.

167.  Defendants' false and misleading statements and labeling data already have influenced and will continue to materially influence purchasing decisions to the detriment of Plaintiff, including by (a) diverting business which Plaintiff would otherwise receive to labs willing to inflate their results, and (b) decreasing the value of accurate and compliant testing of cannabis products.

168.  As a direct and proximate result of the wrongful and intentional actions of Defendants' wrongful and intentional actions, Plaintiff has been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a.  Award judgment in its favor against Defendants on all its Counts;

b.  Award damages in its favor and against Defendants;

c.  Award Plaintiff all profits derived by Defendants' wrongful acts complained of herein;

d.  Award Plaintiff costs and reasonable attorney fees pursuant to 15 U.S.C. § 1117.

e.  Award Plaintiff such other relief, in law or equity, as this Court deems just and proper.

**COMPLAINT**

Dated: June 24, 2024            **WADE KILPELA SLADE LLP**

By: */s/ Sara D. Avila*
    _____
    Edwin J. Kilpela, Jr. (*pro hac vice* application
    forthcoming)
    ekilpela@waykayslay.com
    David Slade (*pro hac vice* application forthcoming)
    Sara D. Avila, State Bar No. 263213
    sara@waykayslay.com
    Marc A. Castaneda, State Bar No. 299001
    marc@waykayslay.com
    James LaMarca
    jlamarca@waykayslay.com (*pro hac vice*
    application forthcoming)
    2450 Colorado Ave.
    Suite 100E
    Santa Monica, CA 90404

    **SCOTT+SCOTT**
    **ATTORNEYS AT LAW LLP**
    Alex Barlow (*pro hac vice* application
    forthcoming)
    abarlow@scott-scott.com
    TX State Bar No. 24006798
    Kyle Dingman (*pro hac vice* application
    forthcoming)
    kdingman@scott-scott.com
    TX State Bar No. 24078428
    7718 Wood Hollow Dr.
    Suite 105
    Austin, TX 78731
    *Attorneys for Plaintiffs*

**COMPLAINT**